JORY C. STEELE, SBN 206944
ALAN L. SCHLOSSER, SBN 49957
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA  94111

Telephone:  (415) 621-2493
Facsimile:  (415) 255-1478
jsteele@aclunc.org

DONALD W. BROWN, SBN 83347
STEPHEN E. GEORGE, SBN 244512
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA  94111

Telephone: (415) 591-6000
Facsimile: (415) 591-6091
sgeorge@cov.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL L. GENSAW III, ET AL.<br><br>    Plaintiffs,<br><br>v.<br><br>DEL NORTE COUNTY UNIFIED SCHOOL DISTRICT, ET AL.<br><br>    Defendants. | Civil Case No.: C 07 3009 TEH<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT**<br><br>Date:      March 3, 2008<br>Time:      10:00 am<br><br>Honorable Thelton E. Henderson |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED .......................... 1

II.   FACTUAL BACKGROUND.......................................................................... 4

III.  ARGUMENT................................................................................................ 6

      A.   Standard of Review................................................................... 6

      B.   Plaintiffs' Requested Relief Is Neither Unconstitutional Nor Grounds
           for Dismissing Their Complaint ............................................. 8

      C.   The Complaint States Claims for Violations of the Equal Protection
           Clause and Title VI, Alleging Facts Demonstrating That Defendants
           Intentionally Discriminated Against Plaintiffs ...................... 11

      D.   Plaintiffs' § 1983 Claim Is Not Barred by Title VI ............................ 16

      E.   Plaintiffs' § 1983 Claim Is Not Barred by the 11th Amendment ....................... 22

IV.   CONCLUSION............................................................................................ 23

1

2

3

# TABLE OF AUTHORITIES

**Cases**                                                                                                                **Page(s)**

*A.W. v. Jersey City Pub. Schs.,*
   486 F.3d 791 (3d Cir. 2007)…………………………………………………………24

*ASW v. Oregon*, 424 F.3d 970 (9th Cir. 2005)…………………………………………17

*Alexander v. Sandoval,*
   532 U.S. 275 (2001)……………………………………………………...............16

*Alexander v. Underhill,*
   416 F. Supp. 2d 999 (D. Nev. 2006)………………………………………..22, 24

*Asher v. Reliance Ins. Co.,*
   308 F. Supp. 847 (N.D. Cal. 1970)………………………………..….9

*Barren v. Harrington,*
   152 F.3d 1193 (9th Cir. 1998)…………………………………………….…12

*Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998)……………………15

*Bell Atl. Corp. v. Twombly,*
   127 S. Ct. 1955 (2007)……………………………………………………8

*Bennett v. Yoshina,*
   140 F.3d 1218 (9th Cir. 1998)………………………………………….…26

*Blessing v. Freestone,*
   520 U.S. 329 (1997)…………………………………………………………19

*Boulahanis v. Bd. of Regents*, 198 F.3d 633 (7th Cir. 1999)…………………...…………18

*Bradley v. Milliken*, 484 F.2d 215 (6th Cir. 1973)……………………………………9

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)…………………………………………9

*Cannon v. Univ. of Chicago,*
   441 U.S. 677 (1979)………………………………………………...…21, 24

*City of Rancho Palos Verdes v. Abrams,*
   544 U.S. 113 (2005)………………………………………………22, 23, 24, 25

*Communities for Equity v. Michigan High Sch. Athletic Ass'n,*
   459 F.3d 676 (6th Cir. 2006) ……………………………………… 17, 18, 19

*Cousins v. Sec'y of the U.S. Dept. of Transp.,*
   857 F.2d 37 (1st Cir. 1988)………………………………………….…20, 22

*Crawford v. Davis,*
   109 F.3d 1281 (8th Cir. 1997)…………………………………..……25

*Doe v. Kamehameha Schs.,*
   470 F. 3d 827, 848 (9th Cir. 2006)……………………………………..11

*Doe v. U.S. Dep't of Justice,*
   753 F.2d 1092 (D.C. Cir. 1985)……………………………………………9

*Doss v. S. Cent. Bell Tel. Co.,*
   834 F.2d 421 (5th Cir. 1987)……………………………………..……9

*Edelman v. Jordan*, 415 U.S. 651 (1974)……………………………………………………22

*Ex parte Young,*
   209 U.S. 123 (1908)………………………………………………………………26, 27

*Green v. Mansour*, 474 U.S. 64 (1985)……………………………………………………23

*Gilligan v. Jamco Dev. Corp.,*
   108 F.3d 246 (9th Cir. 1997)……………………………………………………….7

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)………………………..…11

*Goodisman v. Lytle,*
   724 F.2d 818 (9th Cir. 1984)………………………………………………...……26

*Goodman v. President and Trustees of Bowdoin Coll.*, 135 F. Supp. 2d 40 (D. Me. 2001)……15

*Goss v. Lopez*, 419 U.S. 565 (1975)………………………………………………..……..11

*Gould Elecs., Inc. v. United States,*
   220 F.3d 169 (3d Cir. 2000)………………………………………………...………9

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982)………………………………………………………..…………8

*Hart v. Massanari,*
   266 F.3d 1155 (9th Cir. 2001)……………………………………………………...22

*Johnson v. California,*
   207 F.3d 650 (9th Cir. 2000)………………………………………………….……7

*K.R. v. School Dist. of Philadelphia,*
   No. 06-2388, 2007 WL 2726236 (E.D. Pa. Sept. 14, 2007)…………………………23

*Langlois v. Abington Hous. Auth.,*
   234 F. Supp. 2d 33 (D. Mass. 2002)…………………………………………………19

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,*
   507 U.S. 163 (1993)……………………………………………………………………7

*Lee v. City of Los Angeles,*
   250 F.3d 668 (9th Cir. 2001)…………………………………………………………12

*Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006)…………………………………….....15

*Massey v. Banning Unified Sch. Dist.,*
   256 F. Supp. 2d 1090 (C.D. Cal. 2003)………………………………………………9

*McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668 (1963)………..……..……20

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981)…....…passim

*Milliken v. Bradley*, 418 U.S. 717 (1974)
   ………………………………………………………………………………………11

*Milliken v. Bradley*,433 U.S. 267 (1977)
   ………………………………………………………………………………………10

*Monroe v. Pape*, 365 U.S. 167 (1961)…………………………………………..…..…..…20

*Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835 (9th Cir. 2002)……………………..………23

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738 (2007)……..……11

*Pareto v. F.D.I.C.*,
    139 F.3d 696, 699 (9th Cir. 1998)……………………………………………..8

*Parks Sch. of Bus., Inc. v. Symington*,
    51 F.3d 1480 (9th Cir. 1995)…………………………………………………..8

*Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998)………………………………15

*Pegram v. Herdrich*, 530 U.S. 211 (2000)……………………………….…………...16

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)………………………………………………………………15

*Powell v. Ridge*,
    189 F. 3d 387 (1999)……………………………………………………….passim

*Pryor v. Nat'l Collegiate Athletic Ass'n*,
    288 F.3d 548 (3d Cir. 2002)………………………………………………..7, 14

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)……………………………………………………………12

*Sanders v. Brown*, 504 F.3d 903 (9th Cir. 2007)…………………………………..…………15

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974)………………………………………………………………8

*Schweiker v. Chilicky*, 487 U.S. 412 (1988)……………………………………...……8

*Seamons v. Snow*,
    84 F.3d 1226 (10th Cir. 1996)…………………………………………………20

*SEC v. Seaboard Corp.*, 677 F.2d 1315 (9th Cir. 1982)…………………….……………7

*Serrano v. Francis*,
    345 F.3d 1071 (9th Cir. 2003)…………………………………………….……17

*Smith v. Robinson*,
    468 U.S. 992 (1984)……………………………………………...…..19, 23, 24, 25

*Starbuck v. City & County of San Francisco*,
    556 F.2d 450 (9th Cir. 1977)…………………………………………………22

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)…………………………………………………..8, 14

*Travis v. Folsom Cordova Unified Sch. Dist.*,
    No. 2:06-cv-2074-MCE-EFB, 2007, WL 529840 (E.D. Cal. Feb. 20, 2007)……22, 23, 24

*United States v. Fordice*,
    505 U.S. 717 (1992)………………………………………………………………15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)……………………………………………….……………13

*Wisler v. City of Fresno*,
    No. CV F 06-1694 AWI SMS, 2007 WL 833060 (E.D. Cal. Mar. 16, 2007)……………9


**Federal Statutes**

42 U.S.C. § 1983.............................................................................................. 4

Native American Languages Act,
    25 U.S.C. § 2901................................................................................. 10

No Child Left Behind: Indian, Native Hawaiian, and Alaska Native Education,
    20 U.S.C.§ 7441(c)(C) & (L)................................................................ 10

Title VI of the Civil Rights Act of 1964............................................. passim


**State Statutes**

Cal. Gov't Code § 11135 ............................................................................. 4


**Rules**

Fed. R. Civ. P. 8(a) .................................................................................... 6

Fed. R. Civ. P. 12(b)(6) ............................................................................. 2

Fed. R. Civ. P. 12(d) ………………………………………………………...15

## I.    INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED

This civil rights class action lawsuit is filed by ten minors by and through their guardians against the Del Norte County Unified School District ("District"), five members of the District's Board, and the District's Superintendent.  The six individual defendants are sued in their official capacities.  Plaintiffs challenge the District's decision to close the middle school (sixth, seventh and eighth) grades of Margaret Keating Elementary School ("MKS" or "Margaret Keating"), located on the Yurok Reservation in Klamath, California, and to reassign the middle school students to Crescent Elk Middle School, more than twenty miles of winding road away in Crescent City, California.  Plaintiffs bring this action on their own behalf and on behalf of others who but for the closure would have been able to attend MKS.

Margaret Keating is (it remains open for grades K through fifth) and was for the middle schoolers a significant center of Native American cultural heritage, important to the preservation and nurturing of the traditions, values, language and history of the Yurok Tribe.  At the time the middle school grades were closed, some two-thirds of the MKS middle school students were Native Americans, and parents and other members of the Tribe living on the Reservation were actively involved in teaching and otherwise fostering Yurok culture, values and traditions at MKS for the benefit of the middle school students.

In closing the middle school grades at MKS and reassigning the students to Crescent Elk, Defendants unlawfully discriminated against Plaintiffs on the basis of race and national origin.  Defendants singled out for closure the one school in the District that had a majority Native American student population, and that taught and provided activities preserving Yurok culture, language and history.  Defendants knew and intended that their decision would have a disproportionate adverse impact on Native Americans and, in making their decision, Defendants were motivated by racially discriminatory purpose and intent.  Plaintiffs, therefore, have sued Defendants pursuant to the Equal Protection Clause of the Fourteenth Amendment to the Constitution (and 42 U.S.C. § 1983) (Count One); Title VI of the Civil Rights Act of 1964 (Count Two); and Cal. Gov't Code § 11135 (Count Three), seeking an injunction mandating that Defendants re-open and maintain the middle school grades at Margaret Keating.

Defendants have moved the Court to dismiss Plaintiffs' Complaint in its entirety, claiming that it fails to state any claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).[1] Defendants make four basic arguments. First, Defendants argue that the Complaint as a whole fails to state a claim on which relief can be granted because the requested relief – an injunction requiring that the middle school grades at Margaret Keating be re-opened – would amount to court-ordered "segregation" in violation of the Equal Protection Clause.[2] Even if Defendants were correct that the form of *relief* specified in the Complaint is not appropriate, that failing would not constitute a failure to state a cognizable *claim* upon which relief (of some kind) can be granted. In any event, Defendants' claim that Plaintiffs are seeking to "promote" rather than remedy racial discrimination is absurd. As explained below, Plaintiffs simply are seeking to undo a racially motivated, racially discriminatory school closing that had a disproportionate adverse impact on the class of Native American children Plaintiffs represent.

Second, Defendants argue that Plaintiffs have failed to sufficiently allege racial discrimination in that (Defendants say) (1) the fact that one-third of the students affected by the MKS school closure were white, and the fact that *more than eight months later* the District closed a second school where most of the affected students were white, somehow make the MKS closure non-discriminatory (Defs.' Mem. at 3:7-13; 13:4-25), and (2) the Complaint does not allege facts that support an inference that the decision to close MKS was racially motivated (Defs.' Mem. at 3:2-7; 13:25-15:2).

_____

[1] Plaintiffs understand that the Eleventh Amendment precludes them from suing the District pursuant to 42 U.S.C. § 1983, and that Title VI does not afford a cause of action against the individual defendants. Plaintiffs did not intend to sue the District pursuant to 42 U.S.C. § 1983, nor did they intend to sue the individual defendants pursuant to Title VI. To the extent the Court interprets the Complaint to do either, Plaintiffs are prepared to voluntarily dismiss the District from Count One and the individual defendants from Count Two.

Plaintiffs acknowledge that they may not assert their Cal. Gov't Code § 11135 claim (Count Three) against Defendants in this Court, absent their consent. Plaintiffs included their § 11135 claim in the hope that Defendants share Plaintiffs' desire to avoid the potential burden, expense, and inefficiencies of a second lawsuit. If, however, Defendants want to assert the Eleventh Amendment in jurisdictional defense as to Count Three, Plaintiffs are prepared to dismiss that Count as to all Defendants.

[2] Defendants' Memorandum of Points and Authorities, dated November 29, 2007 ("Defs.' Mem.") at 2:23-26; 9:3-12:11.

As explained below, the allegations of the Complaint more than sufficiently establish *both* disparate impact on Native American school children *and* Defendants' intent to discriminate on the basis of race and national origin.  That white students also were displaced from MKS does not eliminate or diminish the disparate impact on Native Americans.  Moreover, the "fact" of the second school closure is *not* alleged in the Complaint and, even if it were, would not in any way neutralize the racially disparate impact of the MKS closure.  In addition, beyond allegations of disparate impact (which themselves support the conclusion that the decision to close MKS was racially motivated), the Complaint alleges numerous additional facts – including historical discrimination against Native Americans in the community; the Board's failure to follow normal record-keeping and other procedures; the fact the Board claims MKS was closed to save money, in the face of its own "Blue Ribbon" finance committee's findings that closing MKS would generate the *least* cost savings, and the committee's recommendation that other schools be closed to save money; and the Board's failure to document its discussion and decision to close MKS – demonstrating Defendants' discriminatory intent.

Third, Defendants contend that Title VI "subsumes" 42 U.S.C. § 1983 and, therefore, Plaintiffs may not bring a § 1983 claim against the individual defendants for violation of Plaintiffs' constitutional rights to equal protection.  Defs.' Mem. at 3:14-16; 15:6-17:19.  Defendants have not met their substantial burden to demonstrate that, in passing Title VI, Congress intended to take away Plaintiffs' rights under the Equal Protection clause of the Fourteenth Amendment pursuant to § 1983.  There is a strong presumption against such implied preemption, and courts have held that federal statutes preclude relief pursuant to § 1983 only in select cases where a statute includes an unusually comprehensive enforcement scheme that makes it very clear that Congress meant to make the statute the exclusive avenue for relief.  As explained below, Title VI is not such a statute.

Fourth, Defendants argue that Plaintiffs may not assert a § 1983 claim against the individual defendants because injunctive relief is not available (for the supposedly "segregationist" reasons discussed above) and, therefore, the prospective-relief exception to

1    sovereign immunity does not apply.  Defs.' Mem. at 17:20-18:24.  Because Plaintiffs in fact

2    have stated a proper claim to prospective relief, Defendants' sovereign immunity argument fails.

3    **II.      FACTUAL BACKGROUND**

4            Plaintiffs contend that Defendants' June 9, 2005, decision to close the middle school

5    grades at Margaret Keating Elementary School on the Yurok Reservation in Klamath, and to

6    reassign and bus the displaced students to Crescent Elk, was racially motivated and had a

7    disparate adverse impact on Native American children.  Plaintiffs therefore filed this action

8    seeking injunctive relief pursuant to 42 U.S.C. § 1983 for deprivation of the plaintiff class's

9    equal protection rights guaranteed by the Fourteenth Amendment; violation of Title VI; and

10   violation of Cal. Gov't Code § 11135.  Complaint, dated June 8, 2007 ("Compl.") ¶¶ 10, 64-75.

11           Plaintiffs bring this action on behalf of all Native American children living in Del Norte

12   County who would attend grades six, seven and/or eight at MKS in the 2007-2008 and

13   subsequent academic years but for Defendants' closure of those grades.  Compl. ¶ 34.  Plaintiffs

14   do not seek damages.  Instead, Plaintiffs request that the Court require Defendants to rectify

15   their racial discrimination by re-opening the middle grades of MKS.  *Id.* at 21-22.

16            The Yurok Reservation and the Margaret Keating school are about twenty miles away

17   from Crescent City, California.  Compl. ¶¶ 1, 4.  At the time the District decided to close MKS,

18   approximately 67% of the students attending the school were Native Americans.  *Id.* ¶ 2.  MKS

19   plays a crucial role in preserving the traditions of the Yurok Tribe.  *Id.*  The school provides

20   instruction in the Tribe's history, language, and traditional skills, and also serves as a meeting

21   place where students and the community can participate in Native American activities outside

22   school hours.  *Id.*

23           In October 2004, the Board of the Del Norte County Unified School District ("Board")

24   established a "Blue Ribbon Facilities Committee," to consider ways to reduce the District's

25   costs by modifying its use of facilities.  Compl. ¶ 40.  In February 2005, the Blue Ribbon

26   Facilities Committee recommended that the Board consider closing Pine Grove Elementary

27   School, located in Crescent City, because doing so would result in the largest savings.  *Id.* ¶ 43.

28   The Blue Ribbon Facilities Committee also recommended that the Board consider closing the

1    middle school grades of Mountain Elementary School, an option that would require busing but

2    would not incur additional transportation costs because busing was already occurring.  *Id.*

3    Finally, the Blue Ribbon Facilities Committee suggested the possibility of closing the middle

4    school grades of MKS, which would be the least effective way to save money because of the

5    additional transportation expenses of busing MKS students to Crescent City.  *Id.*

6         The Board met first with Pine Grove Elementary School parents, and then with

7    Mountain Elementary School parents, to discuss closing those schools.  Compl. ¶ 44.  After each

8    meeting, the Board announced that it had decided not to close either school.  *Id.*  Only then did

9    the Board meet with the parents of MKS, the only other school suggested for possible closure.

10   *Id.* ¶ 45.  The Board convened this meeting without first notifying MKS parents of the meeting's

11   agenda, denying them an opportunity to prepare to discuss closing part of MKS.  *Id.*  Contrary

12   to its normal procedure, the Board did not keep any written records of these meetings to discuss

13   school closure.  *Id.* ¶¶ 46, 50.

14        After meeting with MKS parents, and in the face of fierce opposition from the Native

15   American and general Klamath communities, the Board decided to close the MKS middle

16   school grades.  Compl. ¶¶ 47-48.  In doing so, the Board chose the option that was projected to

17   provide the least savings for the District.  *Id.* ¶ 49.  Moreover, this option promised the most

18   disruption to students, since the affected MKS students would have to travel over an hour and a

19   half each way to get to Crescent Elk in Crescent City.  *Id.* ¶¶ 4, 43.  Most significantly, this

20   option would result in the greatest impact on Native American students, since no other school in

21   the District besides MKS had a student body that was more than 23% Native American.  *Id.*

22   ¶¶ 49, 56.

23        The Board's decision to implement a school closure may well have been motivated by

24   financial considerations.  But the Board's decision to close the middle school grades at *MKS*

25   rather than some other school, where the cost savings would be greater, was motivated by racial

26   animus.  The fact that closing the MKS middle school grades was the least economical and most

27   disruptive option among those identified by the Blue Ribbon Committee, the Board's departure

28   from ordinary procedures in making its decision, and the Board's knowledge of the

1  disproportionate impact this decision would inevitably have on Native American students, all

2  support the conclusion that the Board acted with discriminatory intent when it chose to close

3  down MKS instead of another school.  Compl. ¶¶ 7, 37.

4  The United States Department of Education Office of Civil Rights ("OCR") investigated

5  the District's decision to close the Margaret Keating middle school grades.  Compl. ¶¶ 6, 53.

6  The OCR concluded that in making its decision, the District did not comply with the

7  requirements of Title VI, because the closure of the MKS middle school grades had a

8  disproportionate impact on Native American students.  *Id.*

9  The closure of the MKS middle school grades has caused significant, continuing harm to

10  the affected Native American students.  Students must now endure bus trips of approximately

11  one and a half hours each way to reach Crescent Elk Middle School.  *Id.* ¶¶ 4, 8.  As a result,

12  these students have little time to study or participate in tribal activities and events either before

13  or after school.  *Id.* ¶ 8.  In addition, the displaced Native American students no longer have

14  access to the unique cultural resources MKS provides.  *Id.* ¶¶ 8, 60.  At Crescent Elk, Native

15  American students have experienced racial harassment from other students, and racial

16  discrimination by teachers, negatively impacting these students' ability to learn and succeed.  *Id.*

17  ¶¶ 8, 61-63.  As long as the MKS middle school grades remain closed, Native American

18  children in the community who would otherwise attend middle school at MKS will continue to

19  suffer such harms.  *Id.* ¶ 9.

20  **III.   ARGUMENT**

21  **A.   Standard of Review**

22  The Federal Rules of Civil Procedure require only a "short and plain statement of the

23  claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  This standard contains

24  a "powerful presumption against rejecting pleadings for failure to state a claim," and prevents

25  courts from granting motions to dismiss absent exceptional circumstances.  *Gilligan v. Jamco*

26  *Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).

27  This is particularly true in civil rights cases, where the Ninth Circuit has "rejected the

28  concept of a 'heightened pleading standard'" (*Gilligan*, 108 F.3d at 249), concluding that

1    instead "federal courts and litigants must rely on summary judgment and control of discovery to

2    weed out unmeritorious claims sooner rather than later." *Id.,* quoting *Leatherman v. Tarrant*

3    *County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993); *see also*

4    *Johnson v. California*, 207 F.3d 650, 653 (9th Cir. 2000) (noting "that the rule of liberal

5    construction is particularly important in civil rights cases") (internal quotations and citations

6    omitted); *cf. Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 565 (3d Cir. 2002) (noting

7    in upholding a Title VI claim that "issues involving state of mind (*e.g.*, intent) are often

8    unsuitable for a Rule 12(b)(6) motion to dismiss").[3]

9        In evaluating the sufficiency of a complaint, "[t]he issue is not whether a plaintiff will

10   ultimately prevail but whether [he or she] is entitled to offer evidence to support the claims.

11   Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but

12   that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds*

13   *by Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).  A court may not dismiss a complaint in

14   which plaintiff has alleged enough facts (taken as true) to state a claim to relief that is "plausible

15   on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  Rather, a court may

16   dismiss a claim "only if it is clear that no relief could be granted under any set of facts that

17   could be proved consistent with the allegations."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506,

18   514 (2002).

19       In ruling on a motion to dismiss, courts are bound to take all material allegations in a

20   complaint as true – "even if [the allegations are] doubtful in fact" (*Twombly*, 127 S. Ct. at 1965)

21   – and construe them in the light most favorable to the plaintiff.  *Parks Sch. of Bus., Inc. v.*

22   *Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Indeed, all reasonable inferences that can be

23

24   [3]    Defendants cite *SEC v. Seaboard Corp.*, 677 F.2d 1315, 1316 (9th Cir. 1982), *abrogated*

25   *by In re GlenFed, Inc. Sec. Litig.*, 42 F.2d 1541 (9th Cir. 1994), for the proposition that a court
     need not accept conclusory allegations or legal characterizations.  That case is inapplicable,

26   because it was decided under Fed. R. Civ. P. 9(b)'s heightened pleading standard rather than the
     more liberal pleading standard required by  Rule 8(a), which governs civil rights cases.  Further,

27   the Ninth Circuit disapproved *Seaboard* in *In re Glenfed.*  42 F.2d at 1546 n.6.  Moreover, as
     will be discussed below, Plaintiffs have alleged concrete, particularized facts sufficient to state

28   claims for relief.

drawn from the allegations in the complaint are likewise to be accepted as true and construed in favor of stating a claim.  *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

Finally, Defendants bear the burden of showing that the Complaint's allegations are insufficient to state a claim.  *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000); *Wisler v. City of Fresno*, No. CV F 06-1694 AWI SMS, 2007 WL 833060, *2 (E.D. Cal. Mar. 16, 2007).  As will be discussed below, Defendants have not met this burden.

**B.    Plaintiffs' Requested Relief Is Neither Unconstitutional Nor Grounds for Dismissing Their Complaint**

Defendants argue that Plaintiffs' requested relief is unconstitutional, and that therefore the case should be dismissed.  *See* Defs.' Mem. at 9-12.  This is incorrect.  The appropriateness of Plaintiffs' requested relief is not a proper inquiry for a motion to dismiss.  *See, e.g.*, *Asher v. Reliance Ins. Co.*, 308 F. Supp. 847, 851 (N.D. Cal. 1970) (refusing to dismiss cause of action where relief other than that requested by plaintiff was potentially available); *Massey v. Banning Unified Sch. Dist.*, 256 F. Supp. 2d 1090, 1092 (C.D. Cal. 2003) ("[A] Rule 12(b)(6) motion will not be granted merely because a plaintiff requests a remedy to which he or she is not entitled") (internal marks omitted), citing *Doss v. S. Cent. Bell Tel. Co.*, 834 F.2d 421, 425 (5th Cir. 1987) (holding that "even though [plaintiff] demanded a legal remedy which was improper under the ADEA, the complaint stated a claim sufficient to withstand a motion to dismiss") and *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985) ("It need not appear that plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted") (emphasis in original).[4]

Defendants' argument that the remedy sought – re-opening the school – is unconstitutionally "segregationist" (*see* Defs.' Mem. at 9-12) is nothing more than a thinly veiled attempt to shift the focus away from their own discriminatory actions.  Nowhere in their

---

[4]    Defendants' citation to *Schweiker v. Chilicky*, 487 U.S. 412, 429 (1988), is inapposite. There, claimants were asking the Court to *create* a damages remedy in a congressionally created remedial scheme.  *Schweiker* is simply not relevant to the case at hand, where Plaintiffs are asking for a type of remedy fully contemplated by both the Equal Protection Clause and Title VI.

1  Complaint do Plaintiffs propose segregation as a remedy, nor have Plaintiffs sought to require

2  the District to maintain a specific percentage of Native American students at MKS.

3      While a goal of this litigation is to ensure that Native American students are able to

4  continue to study their own culture and language because it is critical to their ability to grow

5  into full members of their tribe, nowhere have Plaintiffs sought to *exclude* other students from

6  benefiting from the rich cultural heritage which only tribal elders and other members of the tribe

7  can provide.[5]  Indeed, bringing more non-Native American students to MKS would be valuable

8  for students from all ethnic backgrounds for numerous reasons.  For one thing, it would help to

9  reduce the racial isolation in some of the District's schools.  Equally important, it would enrich

10  the entire community because all students would benefit from learning and celebrating the

11  cultural traditions of one of the state's largest Native American communities, one that, happily

12  for the District, is indigenous to the region.  This is the very essence of diversity.

13      As noted in the Complaint, a goal of re-opening MKS is to enable Plaintiffs and those

14  similarly situated to be able, once again, to benefit from the cultural education and study of

15  Yurok language they would have pursued at MKS had the middle school grades remained open.

16  *See, e.g.*, Compl. ¶ 2 (giving examples of cultural education taught at MKS before the closure).

17      Plaintiffs have alleged that by inhibiting Native American students from studying their

18  own cultures and languages, the closure had a particularly deleterious effect on individual

19  Native American students.  *See* Compl. ¶¶ 57, 58 (noting the special duty the government owes

20  Native Americans as the result of our nation's long history of removing Native American

21  children from their communities at critical times in their development, thus accelerating the

22  destruction of indigenous cultures).  Indeed, because of this shameful history, the goal of

23

24  [5]    Defendants cite to numerous cases illustrating the nation's commitment to integrating its
schools, at least since *Brown* was decided in 1954.  *See* Defs.' Mem. at 9-12, citing, *inter alia,
25  Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) and *Bradley v. Milliken*, 484 F.2d 215, 241 (6th Cir.
1973), *rev'd on other grounds, Milliken v. Bradley*, 418 U.S. 717 (1974).  Plaintiffs do not
26  dispute the evils of segregation.  However, the cases cited by Defendants are simply inapposite
to the issue in this case: whether Defendants discriminated against Native American students by
27  closing the middle school grades at MKS, the only majority-Native American school in the
District.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION        9
TO DISMISS COMPLAINT

1   preserving and safeguarding Native American cultures and languages, as well as ensuring that

2   Native American students are permitted to study their cultures and languages, has been

3   recognized by Congress.  *See, e.g.*, No Child Left Behind: Indian, Native Hawaiian, and Alaska

4   Native Education, 20 U.S.C.§ 7441(c)(C) & (L) (authorizing grants for programs that

5   "recognize and support the unique cultural and educational needs of Indian children, and

6   incorporate appropriately qualified tribal elders and seniors"); *see also* Native American

7   Languages Act, 25 U.S.C. § 2901 (Findings) ("The Congress finds that … the status of the

8   cultures and languages of Native Americans is unique and the United States has the

9   responsibility to act together with Native Americans to ensure the survival of these unique

10  cultures and languages."); *c.f. Doe v. Kamehameha Schs.*, 470 F. 3d 827, 848 (9th Cir. 2006) (in

11  upholding an admissions policy that grants admissions to Native Hawaiians before all others,

12  noting Congress's recognition of the importance of maintaining "special efforts in education

13  recognizing the unique cultural and historical circumstances of Native Hawaiians") (internal

14  citations omitted).  Thus, Defendants' claim that Plaintiffs' goal in bringing this lawsuit is

15  "segregationist" is plainly specious.

16          The fact that MKS was 67% Native American at the time of the closure is relevant

17  simply as one of many factors showing both the disparate impact the closure had on Native

18  American students, and the District's intent to discriminate.  As alleged in the Complaint,

19  Defendants chose to close MKS, the only majority-Native American school in the District,

20  despite the fact that Defendants were aware at the time of their decision both that closing MKS

21  would have a disparate impact on Native American students, and that it was the option that

22  would save the least amount of money.  *See* Compl. ¶¶ 4, 5, 43, 49, 52.  Defendants'

23  discriminatory actions present  the genuine issue in this litigation, and their accusations that

24  Plaintiffs are requesting a "segregationist" remedy is simply a red herring.[6]

25  ────────────────────

[6]      In addition to arguing that the remedy sought is "segregationist," Defendants have

26  argued that it would constitute an impermissible interference with the management of a local
    school district.  *See* Defs.' Mem. at 9.  Defendants are wrong.  While it is indeed "beyond

27  dispute" that courts should not lightly interfere in the affairs of local school boards (*see id.*), it is
    likewise beyond dispute that a court *should* intervene where a local school board's decision

28  violates the law.  *Milliken v. Bradley*, 433 U.S. 267, 281 (1977) (*Milliken II*) (If "school
    (continued…)

1    For all these reasons, the Court should deny Defendants' motion seeking to dismiss the

2    Complaint as seeking unconstitutional "segregationist" relief.

### C. The Complaint States Claims for Violations of the Equal Protection Clause and Title VI, Alleging Facts Demonstrating That Defendants Intentionally Discriminated Against Plaintiffs

5    To state a claim for relief under 42 U.S.C. § 1983 for a violation of the Equal Protection

6    Clause of the Fourteenth Amendment, a plaintiff must allege that a defendant "acted with an

7    intent or purpose to discriminate against the plaintiff based upon membership in a protected

8    class," and that the defendant did so under color of state law. *Lee v. City of Los Angeles*, 250

9    F.3d 668, 686 (9th Cir. 2001), quoting *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir.

10   1998). The same pleading standard applies to Title VI. ("Title VI must be held to proscribe

11   only those racial classifications that would violate the Equal Protection Clause." *Regents of*

12   *Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978)). As noted above, a court must take all

13   material allegations in a complaint as true and construe them in the light most favorable to the

14   plaintiff. *Parks Sch. of Bus.*, 51 F.3d at 1484.

15   Plaintiffs' Complaint plainly satisfies these requirements. Far from being conclusory, as

16   Defendants claim (*see* Defs.' Mem. at 14), Plaintiffs' allegations are concrete and precise, citing

17   specific facts that, taken as true, state claims of intentional discrimination under the Equal

18   Protection Clause and Title VI.

19   In *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-68 (1977),

20   the Court set out a number of factors to be considered when determining whether the

21   government has acted with discriminatory intent. "The impact of the official action 'whether it

22   bears more heavily on one race than another,' may provide an important starting point." *Id.* at

23   ─────────────────

24   authorities fail in their affirmative obligations … judicial authority may be invoked.") (internal marks omitted). Many of the cases cited by Defendants also illustrate this point. *See, e.g.,*

25   *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738, 2768 (2007) (proscribing school district's student assignment program as unconstitutional); *Good News Club*

26   *v. Milford Cent. Sch.*, 533 U.S. 98, 120 (2001) (overriding school's unconstitutional exclusion of religious club); *Goss v. Lopez*, 419 U.S. 565, 584 (1975) (invalidating school's

27   unconstitutional suspensions of students); *Milliken v. Bradley*, 418 U.S. 717, 753 (1974) (*Milliken I*) (remanding to district court for "prompt formulation of a decree directed to

28   eliminating the [unconstitutional] segregation found to exist in the Detroit city schools").

266 (citation omitted).  Courts also determine whether a discriminatory purpose was a motivating factor in the decision by conducting a "sensitive inquiry" into other factors.  *Id.* at 265-66.  Those factors may include "[t]he historical background of the decision … the specific sequence of events leading up to the challenged decision … [d]epartures from the normal procedural sequence … [and] [s]ubstantive departures … particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."  *Id.* at 267 (citations omitted).

Here, the Complaint alleges facts similar to those endorsed as probative of intent in *Arlington Heights* to contend that Defendants intentionally discriminated against Native American students.  *See, e.g.*, Compl. ¶ 38 (historical discrimination against Native Americans in the community); *id.* ¶¶ 45-46 (the Board's failure to follow normal procedures by not giving parents a meaningful opportunity to comment and by not keeping records of discussions about school closure); *id.* ¶¶ 43, 49 (the decision to close part of MKS, purportedly as a cost-saving measure, even though closing other schools would result in greater savings); *id.* ¶ 50 (the failure of the School Board to document any discussions of its decision to close MKS); *id.* ¶ 52 (the School Board closed MKS even though the Blue Ribbon Finance Committee noted that the savings from the closure could be "offset by increased transportation costs and negative impact on the community" and despite the fact that parents of nine MKS students transferred their children outside the District, resulting in an even lower financial savings).

Thus, Defendants' assertion that the Complaint does not allege "particularized facts" that support an inference of discriminatory intent is plainly incorrect.  Indeed, the Complaint's allegation that the Defendants decided to close part of MKS because it knew that doing so would (and did) have a disparate impact on Native American students would, by itself, be sufficient to overcome a motion to dismiss for the failure to state a claim.  *See, e.g.*, *Pryor*, 288 F.3d at 564 (plaintiffs sufficiently alleged intentional discrimination, where they claimed that the defendant intended to discriminate in adopting a facially neutral policy that defendant knew would result in fewer black athletes receiving scholarships). The Complaint's inclusion of additional facts demonstrating discriminatory intent constitutes a developed, particularized set

1    of allegations that requires the Court to deny Defendants' motion.  *See Swierkiewicz*, 534 U.S. at

2    514.

3          In addition to the numerous allegations of facts in the Complaint indicating intent to

4    discriminate, the Complaint also alleges concrete facts illustrating that the District's closure

5    decision had a disparate impact on Native American students.  *See, e.g.*, Compl. ¶ 2 (Native

6    Americans constituted 67% of MKS' student population); *id.* ¶ 3 (MKS is the only school in the

7    District with facilities or faculty substantially equipped to provide instruction on and foster

8    awareness of Native American heritage); *id.* ¶ 6 (OCR found that the closure had a racially

9    disproportionate impact in that it treated MKS differently from majority non-Native American

10   schools); *id.* ¶ 8 (substantial harm to Native American students resulting from closure, including

11   lengthened school day, no access to MKS cultural facilities, no time to participate in pre- or

12   post-school tribal activities, enrollment in school with an environment that is hostile to Native

13   American culture, racial harassment from students, and discriminatory discipline by teachers).[7]

14         Evidence of a disparate impact is especially probative of discriminatory intent if "the

15   adverse consequences … upon an identifiable group are … inevitable."  *Pers. Adm'r of Mass. v.*

16   *Feeney*, 442 U.S. 256, 279 n.25 (1979).  Here, it was inevitable that the decision to close a

17   predominately Native American school would have a disproportionate effect on Native

18   American students, and this is additional evidence that Defendants intentionally discriminated

19   against Native Americans by closing MKS.

20         Defendants also argue that because the District's decision to close the MKS middle

21   school grades impacted some *non*-Native American students, the District did not treat Native

22   American students any differently than other students.  Defs.' Mem. at 13.  The unsettling

23   implication of Defendants' position – that an invidious race-based decision is actionable only if

24

25   _____

     [7]    The Complaint's reference to the disparate impact of the closure of the MKS middle

26   grades is not an attempt to make out either a Title VI or Equal Protection disparate impact
     claim, as Defendants argue.  *See* Defs.' Mem. at 13-14.  Rather, the Complaint discusses the

27   disparate impact on Native American students because that impact is evidence that Defendants
     intentionally discriminated on the basis of race when they decided to close MKS' middle school

28   grades.  *See Arlington Heights*, 429 U.S. at 266.

1   it affects *only* members of the target race *and no one else* – underscores the position's failure to

2   find any support in law.  Defendants do not cite any analogous case to support this startling

3   claim.  *See* Defs.' Mem. at 12-13.

4          Notably, at least one case cited by Defendants, *United States v. Fordice*, 505 U.S. 717

5   (1992), undermines their argument.  In *Fordice*, the Supreme Court found that Mississippi's

6   higher education system was segregated despite the fact that not all of the schools were

7   exclusively African American or exclusively white.  *Id.* at 723 n.2; *see also Powell v. Ridge*,

8   189 F. 3d 387, 396 (1999), *overruled on other grounds by Alexander v. Sandoval*, 532 U.S. 275

9   (2001) (disputing defendants' claim that *all* minority students must be adversely affected and no

10  white students can be affected, noting "[w]e have never held … that as a matter of law the

11  practice complained of must affect a certain minimum percentage of the minority group to

12  justify a finding that the discrimination is because of race").

13         Defendants also suggest that the District's February 2006 decision to close Mountain

14  Elementary School somehow "affirmatively establishes" that the District's June 2005 decision

15  to close the MKS middle school grades did not constitute differential treatment of Native

16  American students.  *See* Defs.' Mem. at 13.  Several responses are in order.  First, Defendants

17  improperly and without foundation rely on the contents of a letter written by the OCR to present

18  the Court with "facts" not alleged in the Complaint.  The Court should not at this point consider,

19  let alone treat as true, the "fact" included in that letter that was not pleaded, *i.e.*, that a second

20  school was closed in February 2006.[8]

21  ───────────────────

22  [8]    The allegation that the OCR investigated the District's decision to close MKS' middle
    school and reassign students to Crescent Elk Middle School, and concluded that the District's

23  actions had a racially disproportionate impact on Native Americans in violation of Title VI,
    appears in one paragraph of the 75-paragraph Complaint.  Compl. ¶ 6.  In paragraph 53, the

24  Complaint makes essentially the same allegations regarding the OCR's findings, including two
    brief quotations from an April 25, 2006 letter written by the OCR.  Defendants contend that

25  these allegations "effectively merge [the letter] into the pleadings," allowing the Court to review
    the letter in ruling on the Rule 12(b)(6) motion to dismiss.  Defs.' Mem. at 5 n.3.

26         Of course, Plaintiffs anticipate that this letter will be relevant and admissible evidence at
    the appropriate stage of litigation.  But, contrary to Defendants' argument, the Complaint's

27  allegations are *not* "factually linked to and admittedly dependant upon" the OCR letter.  *See*
    Defs.' Mem. at 5 n.3.  An extrinsic document may be considered to be incorporated and thus

28  part of a complaint challenged pursuant to Rule 12(b)(6) only if the referenced document is
    (continued…)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION          14
TO DISMISS COMPLAINT

1           If the Court were to consider the OCR letter on this point, it should be noted that while

2   the later closure of Mountain School may be evidence of the legitimacy of the District's

3   financial troubles, that fact would not vitiate the illegitimate, race-based aspect of their

4   motivation in selecting MKS for closure more than eight months earlier.[9]  To establish

5   intentional discrimination, a plaintiff need only show that "a discriminatory purpose [was] *a*

6   motivating factor in [a] decision," not that it was the only factor or even a "dominant or primary

7   one."  *Arlington Heights*, 429 U.S. at 265-66 (emphasis added) (internal marks omitted);

8   *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) ("Intentional discrimination means that

9

10   "central to the plaintiff's claim."  *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007); *Marder*
*v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  The Complaint here does not refer extensively to

11   the OCR letter, and plainly does not rely on the letter as the basis for Plaintiffs' claims.  As
explained below, the Complaint includes independent fact allegations supporting Plaintiffs'

12   claims that the District's actions had a racially disproportionate impact on Native Americans
and violated Title VI.  The Complaint does not "depend[] on" the OCR letter to make those

13   claims; indeed, as Defendants correctly point out, Plaintiffs *cannot* base their claims on
conclusions reached by the OCR.  Defs.' Mem. at 5 n.3 ("the conclusions set forth in the OCR

14   letter are not binding on this Court").  Because Plaintiffs do not base their claims on the OCR
letter or rely on the letter to establish any element of their claims, the letter may not be deemed

15   incorporated into the Complaint and, therefore, Defendants cannot use the letter in support of
their motion to dismiss.  *Compare Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16-17

16   (1st Cir. 1998) (ERISA claim for breach of fiduciary duty depended on trust agreement defining
trustee's duties) *and Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1998), *superseded*

17   *by statute on other grounds as stated in Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676,
681 (9th Cir.2006) (insurance claim depended on the contents of a coverage plan) *with*

18   *Goodman v. President and Trustees of Bowdoin Coll.*, 135 F. Supp. 2d 40, 46-47 (D. Me. 2001)
(42 U.S.C. § 1981, Title VI and breach of contract claims arising from school disciplinary

19   proceedings did not depend on letters from dean to student about disciplined conduct and
judicial board proceedings, transcript of judicial board proceedings, judicial board's

20   recommendation, or administrative committee report.).

21          While Plaintiffs do not dispute the authenticity of the April 25, 2006 OCR letter, they
would dispute at least some of the facts Defendants pull out of that letter, such as the time it

22   takes students to get to Crescent Elk Middle School by bus, and the Defendants' implication that
the OCR concluded that the District's separate decision – more than eight months after it voted

23   to close down the middle school grades at MKS – to close the middle school grades at a
predominantly white school eliminated or somehow mitigated the racially disproportionate

24   impact of the MKS closure on Native Americans.  Defs.' Mem. at 13:10-15.  If the Court were
to elect to consider the OCR letter as Defendants ask, the Court would be required to convert the

25   12(b)(6) motion into a Rule 56 motion for summary judgment, and to give Plaintiffs an
opportunity to respond.  *See* Fed. R. Civ. P. 12(d).  In that event, clearly, at best for Defendants,

26   there would be a disputed issue of fact that would preclude any summary judgment in
Defendants' favor.

27   [9]     Indeed, if the District had initially chosen the most financially significant option, there
may have been no need to close an additional school.

28

1   a defendant acted at least in part because of a plaintiff's protected status.") (internal marks

2   omitted).  The Complaint alleges that the District chose to shut down MKS rather than some

3   other school because MKS was the only school with a predominately Native American student

4   body.  Race played a role in the decision to close the MKS middle school grades before those of

5   a majority white school, even if the District's continuing financial problems forced it to close

6   another school almost a year later, after the OCR investigation was underway.

7           Second, the closure of Mountain School after the closure of MKS' middle school grades

8   only strengthens Plaintiffs' allegations, since among District schools, Mountain Elementary had

9   the second highest percentage of Native American students (after MKS).  *See* Compl. ¶ 56

10  (Native Americans make up 23% of student body at elementary school in the District with next

11  highest percentage of Native American students).[10]  As such, the closure of Mountain School

12  does not undermine the sufficiency of Plaintiffs' allegations of intentional discrimination.

13          Because the Complaint alleges a variety of specific facts that, taken as true, support

14  Plaintiffs' intentional discrimination allegations, Plaintiffs have stated both an Equal Protection

15  claim under § 1983 and a Title VI claim.  Accordingly, Defendants' Motion to Dismiss on this

16  basis should be denied.

17          **D.     Plaintiffs' § 1983 Claim Is Not Barred by Title VI**

18          Plaintiffs have sued the individual defendants here pursuant to 42 U.S.C. § 1983, seeking

19  injunctive relief with respect to those defendants' denial of Plaintiffs' rights to equal protection

20  guaranteed by the Fourteenth Amendment to the United States Constitution ("Count One").

21  Compl. ¶¶ 64-67.[11]  Count One is asserted only against the individual defendants (*see* note 1,

22  _____

23  [10]     Plaintiffs clarify that the school mentioned in the Complaint as having a 23% Native
    American student body is Mountain Elementary School.  *See Pegram v. Herdrich*, 530 U.S.
    211, 230 n.10 (2000) (In responding to a motion to dismiss, a plaintiff may "clarify allegations

24  in [the] complaint whose meaning is unclear.").

25  [11]     Thus, Plaintiffs invoke § 1983 not to enforce rights "secured by … laws" but, rather, to
    obtain a remedy for the violation of rights "secured by the Constitution."  42 U.S.C. § 1983; *see,*

26  *e.g.*, *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F.3d 676, 684 (6th Cir.
    2006).  This, then, is *not* a case in which a plaintiff seeks to enforce rights granted by a federal

27  statute both through the statute itself and through § 1983.  *Cf. City of Rancho Palos Verdes v.*
    *Abrams*, 544 U.S. 113, 121-124 (2005) (§ 1983 may not be used to enforce rights granted by

28  Telecommunications Act); *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453
    (continued…)

1   *supra*) and, because Title VI does not apply to individual state actors, is the sole Federal law

2   count asserted against the individual defendants.  *Id.*

3          In moving to dismiss this count, Defendants must establish that Congress, in enacting

4   Title VI, intended to preclude enforcement of the right to equal protection, as provided by the

5   Fourteenth Amendment, by way of § 1983.  *Smith v. Robinson*, 468 U.S. 992, 1008-09 (1984);

6   *Communities for Equity*, 459 F.3d at 684.  Defendants must show that Congress "'specifically

7   foreclosed a remedy under § 1983'" either "expressly, by forbidding recourse to § 1983 in the

8   statute itself, or impliedly, by creating a comprehensive enforcement scheme that is

9   incompatible with individual enforcement under § 1983."  *Blessing v. Freestone*, 520 U.S. 329,

10  341 (1997) (citation omitted).

11         "Neither Title VI nor the regulation promulgated thereunder purports to restrict the

12  availability of relief under § 1983."  *Powell*, 189 F.3d at 401.  Therefore, Defendants must make

13  "the difficult showing that allowing a § 1983 action to go forward" would be contrary to the

14  intent of Congress as evidenced by "'a remedial scheme that is sufficiently comprehensive to

15  demonstrate congressional intent to preclude the remedy of suits under § 1983.'"  *Blessing*, 520

16  U.S. at 346 (citation omitted).  "The burden of showing an implicit rejection of § 1983 by dint

17  of a 'comprehensive enforcement scheme' is a substantial one."  *Langlois v. Abington Hous.*

18  *Auth.*, 234 F. Supp. 2d 33, 48 (D. Mass. 2002).[12]

19         Neither the Supreme Court nor the Ninth Circuit has addressed the question whether

20  Title VI impliedly preempts § 1983, whether as a means to enforce the Equal Protection Clause

21  in the context of discrimination on the ground of race, color or national origin, or as a means to

22  ───────────────────

23  U.S. 1, 19-21 (1981) (Federal Water Pollution Control Act may not be enforced by way of §

24  1983).  Rather, this is a case in which Plaintiffs seek to enforce *constitutional* rights that exist
    separate and apart from Title VI, granted by the Fourteenth Amendment's Equal Protection
    Clause prior to the enactment of Title VI.  *See Communities for Equity*, 459 F.3d at 684.

25  [12]    *See also Smith*, 468 U.S. at 1012 ("We do not lightly conclude that Congress intended to
26  preclude reliance on § 1983 as a remedy for a substantial equal protection claim.  Since 1871,
    when it was passed by Congress, § 1983 has stood as an independent safeguard against
27  deprivations of federal constitutional and statutory rights."); *ASW v. Oregon*, 424 F.3d 970, 977
    (9th Cir. 2005) ("We … do 'not lightly conclude that Congress intended to preclude reliance on
28  § 1983 as a remedy for the deprivation of a federally secured right.'") (citations omitted).

enforce Title VI itself.  Moreover, there is a split among the Circuit Courts that have addressed

the question of implicit preemption of § 1983 by Title VI.  *Compare Boulahanis v. Bd. of*

*Regents*, 198 F.3d 633, 641 (7th Cir. 1999) *with Powell*, 189 F.3d at 401-403 *and Cousins v.*

*Sec'y of the U.S. Dept. of Transp.*, 857 F.2d 37, 44-45 (1st Cir. 1988).

As noted (at note 11, *supra*), in Count One Plaintiffs seek to vindicate their

*constitutional* rights, rather than some right granted by a second statutory scheme separate and

apart from § 1983.  "This is a critical distinction."  *Communities  for Equity*, 459  F.3d at 684.

> "The [Supreme] Court's analysis both in *Sea Clammers* and *Rancho Palos*
> *Verdes* hinges on the fact that when Congress created the particular rights
> through statute, it also created the particular remedies for those statutory
> violations. * * *  In the present case, however, [plaintiff] asserts violations
> of Title IX *and* of the Fourteenth Amendment, meaning that [plaintiff]'s
> allegations would be actionable even if Congress had never enacted Title
> IX.  The question of what Congress intended, then, concerns not only which
> remedies Congress sought to provide for Title IX violations, but whether
> Congress intended to abandon the rights and remedies set forth in
> Fourteenth Amendment equal protection jurisprudence when it enacted Title
> IX in 1972."

*Id.* (holding that Title IX does not impliedly preempt § 1983) (emphasis original); *see also*

*Seamons v. Snow*, 84 F.3d 1226, 1234 n.8 (10th Cir. 1996) (noting that where plaintiff uses

§ 1983 to vindicate a constitutional right, "plaintiff has a cause of action under § 1983

regardless of [Title IX or] Title VII's concurrent application").[13]

*Smith v. Robinson*, *supra*, is the only case in which the Supreme Court has held that a

*constitutional* claim under § 1983 was barred by a concurrent statute.  In *Smith*, the Court

emphasized that the Education of the Handicapped Act specifically provided plaintiffs with

extensive statutory remedies, and concluded that in view of the "comprehensive nature of the

---

[13]      Cases such as *Communities for Equity* that address the question of Title IX's preclusive
effect on § 1983 claims provide especially useful guidance, given the significant similarities
between Title VI and Title IX's text, structure, and congressional intent.  *Cannon v. Univ. of*
*Chicago*,  441 U.S. 677, 694-96 (1979) ("Title IX was patterned after Title VI…. Both statutes
provide the same administrative mechanism for terminating federal financial support for
institutions engaged in prohibited discrimination.  Neither statute expressly mentions a private
remedy for the person excluded from participation in a federally funded program.  The drafters
of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been
during the preceding eight years."); *see also Cousins*, 857 F.2d at 45 (analogizing from Title
IX's structure and jurisprudence in holding that Title VI does not bar § 1983 claims).

procedures and guarantees set out in [the statute],… it was difficult to believe that Congress also meant to leave undisturbed" a plaintiff's recourse to § 1983 remedies.  468 U.S. at 1011-12.  By contrast, "[n]either Title VI nor the Department of Education regulations establishes 'an elaborate procedural mechanism to protect the rights of [individual plaintiffs], as did the statute at issue in *Smith*."  *Powell*, 189 F.3d at 402, quoting *Smith*, 468 U.S. at 1010-11.  "Nor is it possible to describe the administrative remedies Title VI and the regulations establish as 'unusually elaborate,' as the Court described the enforcement provisions of … the statutes at issue in *Sea Clammers*."  *Powell*, 189 F.3d at 402, quoting *Sea Clammers*, 453 U.S. at 13.  Indeed, "Title VI does not specifically provide individual plaintiffs with any administrative remedy."  *Powell*, 189 F.3d at 402.  Title VI thus does not include a sufficiently comprehensive enforcement scheme to show that Congress intended Title VI to preclude reliance on § 1983, as *Smith* requires in order to bar a § 1983 constitutional claim.  *Id.*; *accord Cousins*, 857 F.2d at 44-45; *see also Communities for Equity*, 459 F.3d at 685, citing *Smith*, 468 U.S. at 1009.

The individual defendants rely largely on *Travis v. Folsom Cordova Unified Sch. Dist.*, No. 2:06-cv-2074-MCE-EFB, 2007 WL 529840, *4-6 (E.D. Cal. Feb. 20, 2007), and *Alexander v. Underhill*, 416 F. Supp. 2d 999, 1005-08 (D. Nev. 2006).[14]  *Travis* and *Alexander* both rely on *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005).  Unlike this case, *Abrams* addressed the question whether plaintiffs could seek relief by way of § 1983 (and obtain remedies pursuant to § 1983) for deprivation of rights granted by a federal *statute* (the Telecommunications Act) rather than a deprivation of *constitutional* rights.  The Supreme Court stated:

> "The provision of an *express*, private means of redress *in the statute itself* is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983.  As we said in a different setting, '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.  Thus, the existence of a more restrictive remedy for statutory violations has been the dividing

---

[14]    These district court opinions, of course, are not binding precedent in this Court.  *See Hart v. Massanari*, 266 F.3d 1155, 1169-71 (9th Cir. 2001); *Starbuck v. City & County of San Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977).

line between those cases in which we have held that an action would lie under § 1983 and those in which we have held it would not."

*Abrams*, 544 U.S. at 121 (emphasis added, citation omitted).

For four reasons, *Travis* and *Alexander*'s (and thus Defendants') reliance on *Abrams* is misplaced.  First, whatever "remedy" Title VI provides relates only to *institutions* that receive federal financial aid.  The individual defendants here cannot say that Title VI provides a more restricted remedy against them and, therefore, Plaintiffs are limited to suing them for remedies provided by Title VI, *because Title VI has no application to them at all*.  Title VI does not provide a more restrictive remedy; it provides vis-à-vis the individual defendants *no remedy at all*.  Congress, in restricting Title VI to institutional recipients of federal funds, manifestly intended to leave § 1983 intact as to persons who might deprive others of their constitutional rights under color of law.[15]

Second, as noted, here Plaintiffs are seeking to enforce *constitutional* rather than statutory rights pursuant to § 1983.  In such a case, the analysis provided by *Smith v. Robinson, supra*, pertains.  The proper question is not simply whether whatever remedy Title VI provides is more restrictive than what § 1983 would allow, but rather, "whether Congress intended to abandon the rights and remedies set forth in Fourteenth Amendment equal protection jurisprudence when it enacted Title [VI]."  *Communities for Equity*, 459 F.3d at 684.  The individual defendants have made no such showing here.  *See also K.R. v. Sch. Dist. of Philadelphia*, No. 06-2388, 2007 WL 2726236, *3 (E.D. Pa. Sept. 14, 2007) (denying motion to dismiss § 1983 claim alleging violation of *constitutional* rights, distinguishing *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791 (3d Cir. 2007), which held that Congress did not intend § 1983 to be available to remedy violations of the Individuals with Disabilities Education Act and Section 504 of the Rehabilitation Act).

---

[15]    That is, Title VI in no way suggests that Congress intended to strip § 1983 of its intended purpose to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights, and to provide a remedy where state law might not be adequate either in theory or in practice.  *See McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668, 671-72 (1963); *Monroe v. Pape*, 365 U.S. 167, 170-87 (1961), *overruled on other grounds by Monell v. Dept. of Social Services*, 436 U.S. 658, 690-94 (1978).

Third, *Abrams* looked to the "provision of an *express*, private means of redress *in the statute itself*" to establish Congressional intent not to leave open a more expansive remedy under § 1983. 544 U.S. at 121 (emphasis added). There is no "express, private means of redress in [Title VI] itself." Unlike the statutes at issue in *Sea Clammers* and *Smith*, Title VI does not expressly establish any private right of action. *Cannon*, 441 U.S. at 696.[16] The only express enforcement mechanism found within the statute's text is the withdrawal of federal funds. *See id.* at 695-96; *Travis*, 2007 WL 529840 at *5. The absence of an express private remedy in the statute cuts against the claim that Congress intended to create an enforcement scheme "so comprehensive that it could serve as the *exclusive* avenue for relief" and, instead, supports an inference that Congress intended that Title VI's remedy not be exclusive. *Communities for Equity*, 459 F.3d at 690-691 (emphasis original); *see also Abrams*, 544 U.S. at 120-21 (focusing on enforcement mechanisms in the explicit text of the statute); *Smith*, 468 U.S. at 1009 (same); *Crawford v. Davis*, 109 F.3d 1281, 1284 (8th Cir. 1997) (in finding an implied private remedy under Title IX, the Supreme Court has indicated that the sole enforcement mechanism in Title IX was *not* meant by Congress to be exclusive and, therefore, there is insufficient evidence that Congress intended to foreclose the use of § 1983 to redress violations of Title IX).

Fourth, *Abrams* expressly *rejected* the proposition that "the availability of a private judicial remedy conclusively establishes a congressional intent to preclude § 1983 relief." 544 U.S. at 122. "The ordinary inference that the remedy provided in the statute is exclusive can surely be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id.* We have already noted that the Supreme Court, in finding an implied cause of action under Title VI, has indicated that the remedies set out in the statute itself

---

[16]    In 1986, Congress expressly abrogated States' sovereign immunity against suits brought in federal court to enforce Title VI, providing that in a suit against a State "remedies (including remedies both at law and in equity) are available … to the same extent as such remedies are available … in the suit against any public or private entity other than a State" (42 U.S.C. § 2000d-7(a)(2)), and, in doing so, "validat[ed]" *Cannon*'s holding that private individuals may sue to enforce section 601 of Title VI. *See Sandoval*, 532 U.S. at 280. But it nonetheless remains the case that the private remedy is implied, rather than expressly set out in the statute.

are *not* meant to be exclusive. Indeed, 42 U.S.C. § 2000d-7 (*see* note 16, *supra*), in referring broadly to the availability of "remedies (including remedies both at law and in equity)" adds to the case that Congress expected that the remedies provided in Title VI would "complement, rather than supplant, § 1983." The Court should so hold.

###    E.    Plaintiffs' § 1983 Claim Is Not Barred by the 11th Amendment

As Defendants acknowledge (Defs.' Mem. at 18:7-9), sovereign immunity granted by the Eleventh Amendment does not bar suits for prospective relief against individual state officials acting in their official capacity.[17] *Edelman v. Jordan*, 415 U.S. 651, 664-66 (1974); *Ex parte Young*, 209 U.S. 123, 159-60 (1908); *Bennett v. Yoshina*, 140 F.3d 1218, 1224 (9th Cir. 1998). As Defendants also acknowledge (Defs.' Mem. at 18:10-12), the relief Plaintiffs seek – an injunction requiring that the District re-open and maintain the middle school grades at MKS (Compl. ¶ 10) – is prospective in nature.[18]

The sole basis for the individual defendants' motion to dismiss Count One premised on sovereign immunity is their argument that the prospective injunctive relief Plaintiffs seek would result in "an order implementing school segregation" that would be "unconstitutional" and,

---

[17]    Plaintiffs have not brought their § 1983 claim against the School District. *See* note 1, *supra*.

[18]    *See, e.g.*, *Milliken II*, 433 U.S. at 290 (injunction requiring school district to desegregate "is not barred by the Eleventh Amendment" because, even though the injunction is "also 'compensatory' in nature," it is "part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system") (emphasis in original); *Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984) (§ 1983 claim seeking injunction reinstating plaintiff to former job seeks "prospective relief" and therefore is not barred by the Eleventh Amendment); *Bennett*, 140 F.3d at 1221-22, 1224 (injunction invalidating results of election is "prospective, not retrospective, relief" and therefore not barred). The fact that the District's compliance with such an injunction would result in the expenditure (or reallocation) of District funds does not remove the remedy from the ambit of the exception. Where state expenditures are "the necessary result of compliance with [courts'] decrees which by their terms [are] prospective in nature," money payments ancillary to injunctions do not offend principles of sovereign immunity. *Edelman*, 415 U.S. at 667-68 (An injunction's "ancillary effect on the state treasury is a permissible and often inevitable consequence of the principle announced in *Ex parte Young*."); *Goodisman*, 724 F.2d at 820 (allowing an injunction requiring plaintiff's reinstatement to former job because "[t]he Eleventh Amendment does not prohibit an award of prospective relief that requires ancillary payment from the state treasury"); *see, e.g.*, *Milliken II*, 433 U.S. at 288-90 (injunction placing on school district educational costs of compliance with remedial desegregation programs "fits squarely within the prospective-compliance [*Ex parte Young*] exception reaffirmed by *Edelman*").

1  therefore, such relief is "unavailable" – disqualifying Plaintiffs' § 1983 claims from the *Ex parte*

2  *Young* prospective-compliance exception. Defs.' Mem. at 18:10-24.[19] Plaintiffs have already

3  addressed that argument above at section III.B., and for the reasons stated there, Defendants'

4  assertion of Eleventh Amendment immunity from Plaintiffs' § 1983 claims against the

5  individual defendants should be denied.

6  **IV.    CONCLUSION**

7  For the reasons set forth above, the Court should deny Defendants' Motion to

8  Dismiss Complaint.

9

10  Respectfully Submitted,

11

12  DATED:   January 16, 2008              AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION OF NORTHERN CALIFORNIA
13

14                                          By: _____
                                                Jory C. Steele        /by DWB
15

16

17  DATED:   January 16, 2008              COVINGTON & BURLING LLP

18                                          By: _____
                                                Donald W. Brown
19

20                                          Attorneys for Plaintiffs

21

22

23  ─────────────────────
    [19]    What Defendants frame as the "retroactive" relief requested by Plaintiffs – a declaration
24  by the Court that the District's challenged closure decision was unlawful (*see* Defs.' Mot. at 18;
    *cf.* Compl. ¶ 10) – would not, even were it the only remedy sought, require the dismissal of the
25  § 1983 claim. "[T]he Eleventh Amendment does not generally bar declaratory judgment actions
    against state officers," unless the declaratory relief sought is retrospective instead of prospective
26  in nature. *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002). Declaratory relief
    is not retrospective unless it "'would have … much the same effect as a full-fledged award of
27  damages or restitution by [a] federal court.'" *Id.* at 848, quoting *Green v. Mansour*, 474 U.S.
    64, 73 (1985). Plaintiffs here do not seek damages, and the declaratory relief Plaintiffs seek is
28  fully prospective in nature.