IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAMUEL GENSAW III, et al,

              Plaintiffs,

v.

DEL NORTE COUNTY UNIFIED SCHOOL DISTRICT, et al.,

              Defendants.

NO. C 07-3009 TEH

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

This matter came before the Court on April 14, 2008 on Defendants' Motion to Dismiss. Plaintiffs allege that the Del Norte County Unified School District, its Superintendent, and five members of its Board discriminated against Native American students on the basis of race and/or national origin by deciding to close middle school grades of Margaret Keating Elementary School, located on the Yurok Reservation in Klamath, California. Plaintiffs assert claims under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution, Title VI of the Civil Rights Act of 1964, and Cal. Gov. Code § 11135. They seek an injunction requiring Defendants to reopen and maintain the middle school grades at Margaret Keating.

For the reasons set out below, Defendants' motion is GRANTED in part and DENIED in part.

**FACTUAL BACKGROUND**

Plaintiffs are child members of the Yurok Tribe who live in Klamath, California. They sue on behalf of a class of all Native American children living in Del Norte County who would attend grades six, seven and/or eight at Margaret Keating Elementary School

1 ("MKS"), now or in the future, but for the Defendants' decision to close the middle school
2 grades.

3 The Complaint alleges that MKS plays a crucial role in preserving Yurok Tribe
4 traditions and culture. The school provides Yurok language instruction, instruction in
5 traditional tribal skills, and is used as a site for Yurok cultural events and activities after
6 school hours. Complaint ¶ 2. Middle school is a critical period "for formation of tribal
7 identity" as children first reach an age when they can learn, understand, and retain tribal
8 history, culture, and language. *Id.* ¶ 59. No other school in the District is similarly
9 equipped to preserve and provide instruction in Native American culture. *Id.* ¶ 2.

10 In the 2004-2005 school year, approximately 67% of the students enrolled at MKS
11 were Native American. Only 15% of the students in the Del Norte County Unified School
12 District overall were Native American, and no other school in the District had a Native
13 American population greater than 23%. *Id.* ¶¶ 2-3, 56.

14 According to the allegations of the Complaint, beginning in 2004, the District began
15 exploring ways to cut costs. It formed three "Blue Ribbon" committees, including a Finance
16 Committee and a Facilities Committee. ¶ 40. The former was charged with making cost
17 cutting and revenue enhancement recommendations to the Superintendent and School Board,
18 the latter with studying the use of school facilities in the District to make recommendations
19 about cost reductions. *Id.*

20 In February 2005, the Finance Committee made a report to the School Board, stating it
21 would defer to the Facilities Committee, and observing that the average savings of closing
22 any elementary school may be offset by "increased transportation costs and negative impact
23 on the community." ¶ 42. The subsequent Facilities Committee report identified three cost-
24 saving measures. It concluded that the District would save the most money by closing a
25 school in Crescent City, and recommended closing Pine Grove Elementary School. *Id.* ¶ 43.
26 It also recommended that the Board consider changing the predominantly white Mountain
27 Elementary School to a K-5 school, and busing children in grades 6-8 to Crescent City,
28 which it could do without additional expense. *Id.* ¶¶ 43, 5. Third, it concluded that the

2

1  Board could save costs by busing students in grades 6-8 at MKS to Crescent Elk Middle
2  School, but noted that doing so would require additional expense – making this the "least
3  effective cost-saving measure identified in the report." *Id.* ¶ 43.

4  The School Board then met with parents of children at Pine Grove Elementary, and at
5  (or soon after) the meeting announced it would not close that school. *Id.* ¶ 44. Next, the
6  Board met with parents at Mountain Elementary, and announced it would not close middle
7  school grades there. *Id.* The Board did not convene a meeting with parents of students at
8  MKS to discuss possible school closure; instead, the Board raised the topic of closure at a
9  meeting convened for another purpose. *Id.* Contrary to normal practice, the Board kept no
10 minutes or records of these meetings. *Id.* ¶ 46. In fact, the Board made no record of
11 discussions or explanations of how it chose among the cost-saving options recommended by
12 the Blue Ribbon Commissions, or reached its decision to close the middle school grades at
13 MKS. *Id.* ¶ 50.

14 The Native American community vehemently opposed closing the middle school
15 grades at MKS. Community members expressed their concerns to School Board members
16 both at and outside official meetings, including their anxiety that the closure would affect
17 MKS's role as a cultural center, that children would endure long bus rides and so lose time
18 for study and tribal activities, and that parents would have difficulty participating in school
19 activities. *Id.* ¶ 47.

20 At a meeting on June 9, 2005, the School Board formally decided to close grades six
21 through eight at MKS, to reassign the students to Crescent Elk Middle School and to bus
22 them there, effective in the fall of 2005. *Id.* ¶ 48. Plaintiffs allege that by doing so, the
23 Board chose the cost-saving option that would have the greatest impact on Native American
24 children and save the least amount of money. *Id.* ¶ 49. Parents, students, and Klamath
25 community members continued to protest the decision, including by petition and formal
26 complaint. *Id.* ¶ 51.

27 The Complaint alleges that there is a long history in Del Norte County of
28 discrimination against Native Americans on the basis of race and/or national origin, both in

3

and outside of schools. *Id. ¶ 38.* It contends that the District's decision to close Margaret Keating's middle school grades and to reassign and bus the displaced students to Crescent Elk Middle School "was motivated by a racially discriminatory intent and purpose." *Id. ¶ 54.* The effect of the decision was to diminish Plaintiffs' "abilities to be full and active members of their tribe," and has caused some students to suffer racial hostility and disparate discipline in their new schools. *Id. ¶¶ 59-62.*

The Complaint also alleges that the United States Department of Education Office for Civil Rights ("OCR"), the administrative agency charged with enforcing Title VI, investigated the District's decision to close Margaret Keating's middle school grades and "concluded that the Board discriminated against the Margaret Keating Native American Students on the basis of race in violation of Title VI of the Civil Rights Act of 1964." *Id. ¶ 53.* The Complaint goes on to describe and quote portions of the OCR decision. *Id.*

Plaintiffs filed this action on June 8, 2007. They claim that the Defendants' decision to close the middle school grades at MKS violates Plaintiffs' constitutional right to equal protection, Complaint ¶¶ 64-67 (First Cause of Action), Title VI of the Civil Rights Act of 1964, *id.* ¶¶ 68-71 (Second Cause of Action), and Cal. Gov. Code § 11135 (Third Cause of Action), *id.* ¶¶ 72-75. The Complaint seeks class certification, declaratory judgment that acts complained of were unlawful, and a preliminary and permanent injunction requiring Defendants to reopen grades six through eight at Margaret Keating Elementary, "staffed with qualified teachers assigned to teach each grade the full curricula appropriate to that grade and supporting activities that teach and foster Native American languages, history and culture, and permit any and all Native American children living in Klamath and eligible for those grades who wish to do so to attend the middle school grades at Margaret Keating." Complaint, Prayer for Relief ¶ 4.

**LEGAL STANDARD**

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff's allegations fail "to state a claim upon which relief can be granted." Fed. R. Civ. P.

4

1  12(b)(6).  In evaluating the sufficiency of a complaint's allegations, a court must assume the
2  facts alleged in the complaint to be true unless the allegations are controverted by exhibits
3  attached to the complaint, matters subject to judicial notice, or documents necessarily relied
4  on by the complaint and whose authenticity no party questions.  *Lee v. City of Los Angeles*,
5  250 F.3d 668, 688-89 (9th Cir. 2001).  In addition, a court need not "accept as true
6  allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable
7  inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended
8  on other grounds by* 275 F.3d 1187 (9th Cir. 2001).  A court should not grant dismissal
9  unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible
10 on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  Moreover,
11 dismissal should be with leave to amend unless it is clear that amendment could not possibly
12 cure the complaint's deficiencies.  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th
13 Cir. 1998).

## ANALYSIS

### I. The Complaint States Facts Sufficient To Support A Claim for Violation of the Constitutional Right to Equal Protection

Defendants move to dismiss the First and Second Causes of Action, for violation of equal protection rights and Title VI, respectively, on the ground that Plaintiffs fail to allege particularized facts sufficient to state a claim.   The Complaint clearly  alleges facts sufficient to state a claim for intentional discrimination.

To state a claim for relief under 42 U.S.C. § 1983 for discrimination in violation of the Equal Protection Clause, Plaintiffs must allege that "defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee,* 250 F.3d at 686, *quoting Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  To show discriminatory purpose, a plaintiff must establish that "the decision-maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Rosenbaum v. City and County of*

5

*San Francisco,* 484 F.3d 1142, 1153 (9th Cir. 2007), *quoting Wayte v. United States*, 470 U.S. 598, 610 (1985). The parties agree that the same standard applies under Title VI. *See Regents of Univ. of California v. Bakke*, 438 U.S. 265, 287 (1978)("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause")(Brennan, J., concurring).

Defendants first argue that Plaintiffs do not state a claim because closing the middle school grades at MKS affected the Native American and Caucasian students in those grades equally. Because Native American students were not treated differently from similarly situated students outside the protected class, there was no equal protection violation. Memorandum of Points and Authorities in Support of Motion to Dismiss ("Motion") at 13.

This facile argument fails. Plaintiffs can state a claim for violation of the Equal Protection clause if a governmental decision having disparate *impact* is motivated by discriminatory intent. *See Lee,* 250 F.3d at 686, *citing Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264-66 (1977)(proof of disproportionate impact on an identifiable group can satisfy the intent requirement if it tends to show that some invidious or discriminatory purpose underlies the policy); *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir.1999); *see also Powell v. Ridge*, 189 F.3d 387, 396 (3rd Cir. 1999), *overruled on other grounds in Alexander v. Sandoval*, 532 U.S. 275 (2001)(rejecting claim that complaint fails to state a claim under Title VI because it considers "the effect [of the challenged action] on school districts rather than its effect on individuals" and that plaintiffs' comparisons were invalid because "there are some white students in the allegedly disadvantaged minority school districts and some non-white students in the allegedly advantaged white school districts"). Plaintiffs have adequately alleged that the decision to close the one predominantly Native American school in the district rather than some other school had a disparate impact on Native American students and was motivated by discriminatory intent. Complaint ¶¶ 3, 5, 7, 54.[1]

---

[1] Although Plaintiffs do allege that the decision to close MKS had a disparate impact on Native Americans, they do not, as Defendants argue, assert a "disparate impact" claim.

6

1    Defendants also argue that Plaintiffs have not alleged that similarly situated students
2 were treated differently because the District also closed the "predominantly white" Mountain
3 Elementary School as a result of the budget crisis. Motion at 13. The fact that the District
4 closed the middle school grades at Mountain Elementary School (eight months after the
5 decision at issue here) and reassigned and bused those students to Crescent Elk Middle
6 School does not appear in the Complaint; it appears only in the OCR Decision, which
7 Defendants offer with their Motion to Dismiss. Declaration of William F. Mitchell, Exhibit
8 A ("OCR Decision") at 5, 8. Defendants contend that the Court may consider the document
9 in connection with the Motion to Dismiss because Plaintiffs refer to it in their Complaint.
10 Motion at 5-7.

11    On motion to dismiss, the Court can consider documents whose contents are alleged in
12 the complaint even if they are not physically attached to the pleading. *Branch v. Tunnell*, 14
13 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds by Galbraith v. County of Santa*
14 *Clara*, 307 F.3d 1119 (9th Cir. 2002).

> When ... a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).); 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[2] (3d ed.1997) (explaining that courts may consider "[u]ndisputed documents alleged or referenced in the complaint" in deciding a motion to dismiss).

19 *Beddall v. State Street Bank and Trust Co.,* 137 F.3d 12, 17 (1st Cir. 1998); *see also*
20 Wright and Miller, 5A *Federal Practice and Procedure* § 1327, at 439 (3d Ed. 2004)(if
21 plaintiff has referred to a document in the complaint and it is central to the affirmative
22 defense, defendant may introduce the document as an exhibit to a motion attacking the
23 sufficiency of the complaint).

24    Plaintiffs' claims are not "dependent upon" the OCR Decision, *see Beddall, supra*, nor
25 is the Decision "central to the plaintiff's claim," *Sanders v. Brown*, 504 F.3d 903, 910 (9th
26 Cir. 2007); the OCR Decision is not a crucial factual or legal component of Plaintiffs'
27 claims, as a contract would be to a contract claim. Moreover, Defendants ask this Court to
28 rely not on the OCR decision itself, but on *facts* stated in the OCR decision – facts that do

7

not appear in the allegations of Plaintiffs' Complaint, and in some cases contradict those allegations.[2]  The Court therefore will not treat the OCR decision or its factual findings as allegations of the Complaint.

But even if the Court considered the OCR Decision, Plaintiffs' Complaint alleges sufficient circumstantial evidence of discriminatory intent to state a claim.  As the Supreme Court explained in *Arlington Heights*, *supra,*

> Direct evidence of discriminatory purpose and intent may be unavailable. In such a situation, the court must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. "The court must therefore look to the totality of the relevant evidence to determine whether invidious discriminatory purpose was a motivating factor for the decision." *Id.*  The impact of the official action whether it "bears more heavily on one race than another," may provide an important starting point in the analysis. *Arlington Heights*, 429 U.S. at 264-265, 266. A variety of factors may be considered. The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. *Arlington Heights*, 429 U.S. at 267. The specific sequence of events leading up to the challenged decision also may shed some light on the decision maker's purposes. *Arlington Heights*, 429 U.S. at 267. Departures from the normal procedural sequence and the legislative or administrative history are also relevant. *Id.* at 268.

*Committee Concerning Community Imp. v. City of Modesto,* 2007 WL 2408495, *3 (E.D.Cal. August 21, 2007).   Plaintiffs allege many of these factors, in addition to the impact of the school closing on Native Americans:  historical discrimination, Complaint ¶ 38, the Board's failure to follow its ordinary procedures in making the decision by not giving parents an opportunity to comment and failing to keep minutes of its discussions, *id.* ¶¶ 44, 46, 50, and the fact that although the decision was ostensibly motivated by the need to cut costs, the Board ignored the recommendation of its own Blue Ribbon Panel that closure of other schools would save more money.  *Id.* ¶¶ 43, 49.

The Complaint clearly alleges facts sufficient to state a claim for intentional discrimination in violation of the Equal Protection Clause and Title VI.

## II.     The Court Is Not Required To Dismiss Plaintiffs' Claims Because Of The Nature Of The Relief They Seek

---

[2] For instance, the Complaint alleges that former MKS students now have a 1 ½ hour bus ride to Crescent Elk Elementary School, Complaint ¶ 4, 8, while the OCR decision states Crescent Elk is only 30 minutes away.  OCR Decision p. 7.

8

As set out above, the Complaint seeks an injunction requiring Defendants to reopen grades six through eight at Margaret Keating Elementary, "staffed with qualified teachers assigned to teach each grade the full curricula appropriate to that grade and supporting activities that teach and foster Native American languages, history and culture, and permit any and all Native American children living in Klamath and eligible for those grades who wish to do so to attend the middle school grades at Margaret Keating." Complaint, Prayer for Relief ¶ 4. Defendants contend that this remedy is tantamount to unconstitutional racial segregation, and because the remedy Plaintiffs seek is unavailable as a matter of law, their claims must fail. But the core relief Plaintiffs seek is clearly within the power of this Court to order as a remedy for intentional discrimination.

A Complaint will survive a motion to dismiss so long as some relief can be granted.

> [A] Rule 12(b)(6) motion "will not be granted merely because [a] plaintiff requests a remedy to which he or she is not entitled." William W Schwarzer, et al., *Civil Procedure Before Trial* § 9:230. It need not appear that plaintiff can obtain the specific relief demanded as long as the court can ascertain from the face of the complaint that some relief can be granted.

*Massey v. Banning Unified School Dist.* 256 F.Supp.2d 1090, 1092 (C.D.Cal. 2003)(citation and internal quotations omitted).[3]

Although Defendants offer fiery Supreme Court rhetoric about the evils of race-based government decisionmaking, they point to no authority holding that a judicially-ordered remedy is unconstitutional merely because it recreates the preexisting racial makeup of a school. Courts clearly have the power to impose race-conscious remedies for past discrimination, although that authority is carefully circumscribed. *See Parents Involved in Community Schools v. Seattle School District No. 1,* __ U.S. __, 127 S.Ct. 2738, 2751-52 (2007)("well-settled" that government racial classifications must be narrowly tailored to

---

[3] Although Defendants argue that *Schweiker v. Chilicky*, 487 U.S. 412 (1988) holds that a case must be dismissed where the relief sought is "unavailable as a matter of law," that case is inapposite. *Schweiker* concerned "[w]hether a *Bivens* remedy should be implied for alleged due process violations in the denial of social security disability benefits." *Id.* at 420. Because the Court decided it would not allow a cause of action under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), it dismissed the Plaintiff's case. *Id.* at 429. It did not address the question of whether an otherwise viable cause of action fails to state a claim merely because it seeks improper relief.

9

1  achieve a compelling government interest; "remedying the effects of past intentional
2  discrimination" is a compelling government interest);  *Grutter v. Bollinger*, 539 U.S. 306,
3  326, 328 (2003)(government can use racial classifications to remedy past discrimination);
4  *Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship and Training
5  Committee,* 94 F.3d 1366, 1371 (9th Cir. 1996), *quoting City of Richmond v. J.A. Croson
6  Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in the judgment)("we have permitted
7  federal courts to prescribe quite severe, race-conscious remedies when confronted with
8  egregious and persistent unlawful discrimination").[4]

9  But the central relief Plaintiffs seek – reopening the MKS middle school grades – is
10 race-neutral.  Plaintiffs are not asking the Court to require a specific proportion of Native
11 American students at the school, or to maintain or enforce the preexisting race/national origin
12 makeup of the school.  Nor do they request that any other students be excluded from MKS.

13 Requiring the District to reopen middle school grades at MKS might result in a higher
14 concentration of Native American students in one school.  But despite Defendants' hue and
15 cry, such an order would not amount to *de jure* segregation.  As Justice Thomas has
16 observed, "racial isolation" of a school may reflect the demography of an area, or "voluntary
17 housing choices," and "[t]he Constitution does not prevent individuals from choosing to live
18 together, to work together, or to send their children to school together, so long as the State
19 does not interfere with their choices on the basis of race." *Missouri v. Jenkins*, 515 U.S. at
20 115, 121 (Thomas, J., concurring)("the mere fact that a school is black does not mean that it
21 is the product of a constitutional violation").  Opening or reopening a school which will turn

---

[4] Indeed, some argue that "[r]ace-conscious remedies by district courts may be entitled to more deference than strict scrutiny analysis allows to actions by state governments and the federal government. *See United States v. Paradise*, 480 U.S. 149, 193-94 (1987) (Stevens, J., concurring) (arguing that race-conscious remedial orders need not overcome 'strong presumption' against such measures)." Adam Weiss, Note, "Grutter, Community, and Democracy: the Case for Race-conscious Remedies in Residential Segregation" 107 *Columbia Law Review* 1195, 1204 n.57 (2007), *citing United States v. Sec'y of Housing and Urban Development*, 239 F.3d 211, 218-220 (2nd Cir. 2001) (discussing whether strict scrutiny applies to courts ordering race-based remedies after finding intentional discrimination, but finding that even if strict scrutiny is standard, it has been met); and Michelle Wilde Anderson, Comment, "Colorblind Segregation: Equal Protection as a Bar to Neighborhood Integration," 92 *Cal. L. Rev.* 841, 859-61 (2004)(advocating different standards for court remedies). *But see Missouri v. Jenkins*, 515 U.S. at 112-113 (O'Connor, J., concurring)(courts have less discretion than legislatures in finding means to secure constitutional rights).

10

1 out to have primarily students of one race is not always the same as "a governmental policy to separate pupils in schools solely on the basis of race." *Seattle School District*, 127 S.Ct. at 2769 (citation omitted).

The sole authority Defendants have offered to the contrary is the Sixth Circuit's statement in *Bradley v. Milliken,* 484 F.2d 215 (6th Cir.), *rev'd on other grounds,* 418 U.S. 717 (1974) that

> [t]he clearest example of direct State participation in encouraging the segregated condition of Detroit public schools, however, is that of school construction in Detroit and the surrounding suburban areas. Until 1962 the State Board of Education had direct statutory control over site planning for new school construction. During that time, as was pointed out above, the State approved school construction which fostered segregation throughout the Detroit Metropolitan area.

*Id.* at 241. The Sixth Circuit reached this conclusion after considering evidence that the District had engaged in a pattern of constructing schools that were built in either overwhelmingly all black or all white neighborhoods so that the new schools opened as one race schools, and increased the overall segregation of the District. *Id.* at 235-239; *see also Swann*, 402 U.S. at 20-21 ("[I]t is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or reestablish the dual system").

But neither Defendants nor Plaintiffs allege that the concentration of Native Americans at MKS that existed before the middle school grades were closed was the result of unlawful discrimination or segregation. Even if reopening a school is analogous to building one, doing so here would not perpetuate unlawful segregation. Restoring the presumably lawful *status quo* is not unlawful discrimination simply because it is court-ordered.

Plaintiffs do, however, seek more than just the reopening of the school. They also request that the Court order that any Native American child who lives in Klamath may attend the school. This request may seek assignment on the basis of race if such students would not otherwise be assigned to MKS. The Complaint does not reveal whether every middle school child in Klamath would ordinarily be assigned to MKS, so it is impossible to determine, at this juncture, whether this is a request for a racial preference in school assignment.

11

Plaintiffs also seek an order requiring the District to assign a certain number of teachers to each grade, and to provide "supporting activities that teach and foster Native American languages, history and culture." Complaint, Prayer for Relief ¶ 4. Plaintiffs note that Congress has recognized the importance of ensuring the survival of Native American culture and language, and allowed certain programs and preferences in public education to further that goal. Opposition Brief at 10, *citing* No Child Left Behind: Indian, Native Hawaiian, and Alaska Native Education, 20 U.S.C. § 7441(c)(C) and (L), Native American Languages Act, 25 U.S.C. § 2901, and *Doe v. Kamehameha Schools*, 470 F.3d 827, 848-849 (9th Cir. 2006)(allowing private school preference for Native Hawaiians).

It is not clear that the Court could require the District to assign teachers or provide certain classes as a remedy for the race or national origin discrimination alleged. The remedial power of the federal courts may be exercised "only on the basis of a constitutional violation" and is defined by the nature and scope of the "condition that offends the Constitution." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15-16 (1971); *see also Missouri v. Jenkins*, 515 U.S. at 88-102 (court transgresses bounds of its remedial powers by issuing, *inter alia*, orders increasing teacher salaries and requiring certain educational programs to be funded as remedy for segregation, because they are too far removed from constitutional violation).

However, the Court need not resolve whether Plaintiffs will be entitled to all the remedies they seek at this stage. The core relief Plaintiffs seek – reopening a primarily Native-American school as a remedy for its discriminatory closure – would not offend the Constitution as a matter of law. Accordingly, Defendants are not entitled to dismissal on that ground.[5]

---

[5] Defendants also argue that because the prospective relief Plaintiffs seek is unconstitutional, the sole remaining claims (for declaratory judgment) are for retroactive relief and therefore barred by the Eleventh Amendment. Because at least some of the relief Plaintiffs seek is within the authority of this Court to order, this argument fails. Defendants also argue that the relief sought is "retroactive" because it seeks to remedy past harm. But injunctive relief that "serve[s] the purpose of preventing present and future harm" is prospective and not barred by the Eleventh Amendment. *Flint v. Dennison,* 488 F.3d 816, 825 (9th Cir. 2007).

12

**III.    Plaintiffs' § 1983 Claim Is Not Barred By Title VI**

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Defendants contend that because Title VI provides an enforcement mechanism with full remedies for racial discrimination in education, it subsumes Plaintiffs' § 1983 claim alleging violation of their equal protection rights. Defendants have not, however, shown that Congress intended make Title VI the "the exclusive avenue through which a plaintiff may assert" claims alleging racial discrimination in public education. Accordingly, the Court finds that § 1983 claims alleging constitutional claims are not subsumed by Title VI.

The Supreme Court has held that a statutory scheme may bar an action under § 1983. In *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 20 (1981) (*"Sea Clammers"*), for example, the Supreme Court held that when a federal statute provides its own comprehensive enforcement scheme, litigants cannot bypass the requirements of that scheme by suing directly under § 1983 to enforce the federal law. As the Court recently explained, there is only a rebuttable presumption that federal statutory rights are enforceable under § 1983. *City of Rancho Palos Verdes, California v. Abrams*, 544 U.S. 113, 120 (2005)("*Abrams*"), *citing Blessing v. Freestone*, 520 U.S. 329, 341 (1997).

> The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right. *See* [*Blessing*, 520 U.S. at 341]; *Smith v. Robinson*, 468 U.S. 992, 1012 (1984). Our cases have explained that evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a "comprehensive enforcement scheme that is incompatible with enforcement under § 1983."

*Abrams,* 544 U.S. at 120 (citations omitted).

Both *Sea Clammers* and *Abrams* considered whether litigants could sue under § 1983 to enforce rights created by federal statutes. But the Supreme Court has also held that a federal statutory scheme could, in some circumstances, preclude a § 1983 suit to enforce *constitutional* rights (like the § 1983 equal protection claim at issue here). In *Smith v.*

13

*Robinson*, 468 U.S. 992 (1984), the Supreme Court considered whether a disabled child could assert both that defendants failed to provide him with a free and appropriate public education in violation of the Education of the Handicapped Act, 20 U.S.C. § 1400 *et seq.*, and, under § 1983, that they denied his constitutionally guaranteed due process and equal protection rights. *Id.* at 1009. It concluded that Congress intended the statute to be "the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education." *Id.* at 1009. The statute itself and its legislative history indicated that Congress intended plaintiffs with constitutional claims "to pursue those claims through the carefully tailored administrative and judicial mechanism set out in the statute." *Id.*

The Court noted that the statute was explicitly passed as a means of assisting States in carrying out their constitutional responsibility "to provide equal protection of the laws," *id.*, and that it established an "elaborate procedural mechanism" to protect the rights of disabled children, *id.* at 1010-11, including a process by which parents work with the local education agency to formulate an individualized plan for the child, "ongoing parental involvement, detailed procedural safeguards, and a right to judicial review." *Id.* at 1011-1012. In light of the "comprehensive nature" of those procedures and guarantees, Congress did not intend to leave the right to proceed under § 1983 undisturbed. *Id.*

> We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial equal protection claim. Since 1871, when it was passed by Congress, § 1983 has stood as an independent safeguard against deprivations of federal constitutional and statutory rights. Nevertheless, § 1983 is a statutory remedy and Congress retains the authority to repeal it or replace it with an alternative remedy. The crucial consideration is what Congress intended.

*Id.* at 1012. The Court found that in that case, allowing a plaintiff to circumvent the statute's administrative remedies would be inconsistent with Congress's carefully tailored scheme. *Id.*[6]

---

[6] Congress responded to the *Smith* decision by amending the statute to provide that it did not limit the rights, procedures and remedies available under the Constitution. *Mark H. v. Lemahieu*, 513 F.3d 922, 934 (9th Cir. 2008), *citing* 20 U.S.C. § 1415(1).

14

Since *Smith v. Robinson*, a number of courts have considered whether Title VI subsumes § 1983 claims based on the same facts. The circuits are split on the issue, and the Ninth Circuit has not weighed in. The Seventh Circuit has held that "[w]here Congress has set up an enforcement mechanism with full remedies, as it has with Title VI, that regulatory structure may not be bypassed by resort to laws of more general applicability like Section 1983 and Section 1985(3)." *Boulahanis v. Board of Regents,* 198 F.3d 633, 641 (7th Cir. 1999), *citing Sea Clammers*, 453 U.S. at 20. Three district courts, including two in the Ninth Circuit, have agreed. *Travis v. Folsom Cordova Unified School Dist.*, 2007 WL 529840 (E.D.Cal. 2007), *Alexander v. Underhill*, 416 F.Supp.2d 999 (D.Nev. 2006), and *Bayon v. State Univ. of New York at Buffalo,* 2001 WL 135817 (W.D.N.Y. 2001) (same). On the other hand, the Third Circuit and the First Circuit have found that Congress did not intend to preclude a § 1983 remedy. *Powell v. Ridge*, 189 F.3d 387, 402 (3d Cir. 1999), *overruled on other grounds by Alexander v. Sandoval*, 532 U.S. 275 (2001); *Cousins v. Sec'y of U.S. Dep't of Transp.*, 857 F.2d 37, 44-45 (1st Cir. 1988)(Title VI remedies are not "so comprehensive as to indicate a congressional intent to foreclose alternate avenues of relief").

The better view is that Title VI does not preclude § 1983 equal protection claims based on the same facts.

Title VI does not expressly foreclose a remedy under § 1983. Plaintiffs' equal protection claims – that they suffered discrimination – are virtually identical to their Title VI claims. *See Smith v. Robinson*, 468 U.S. at 1009. Therefore, the question is whether Congress intended Title VI to be "the exclusive avenue through which a plaintiff may assert" such claims. *Id.* The defendants bear the burden of demonstrating that Congress has withdrawn the § 1983 remedy. *Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 107 (1989).

The District of Nevada described the Title VI statutory scheme in *Alexander v. Underhill:*

> Title VI's administrative scheme allows persons who believe they were discriminated against to file a written complaint with the responsible department official. 34 C.F.R. § 100.7(b). A complaint that indicates noncompliance with Title VI triggers a prompt

15

1    investigation. 34 C.F.R. § 100.7(c). If the investigation reveals a failure to comply
     with Title VI, the department will take steps necessary to ensure compliance. 34
2    C.F.R. §§ 100.7, 100.8, 100.9. Although these regulations do not provide a monetary
     remedy for a complainant who was discriminated against, the regulations do provide a
3    process designed to effectuate compliance with Title VI. A federally funded entity that
     does not comply with Title VI may ultimately lose its federal financial assistance. 34
4    C.F.R. § 100.8. In addition to the administrative remedies, Title VI contains an
     implied private cause of action through which individuals can obtain both injunctive
5    relief and damages.

6    416 F.Supp.2d at 1007.

7        This is not an "elaborate procedural mechanism" so comprehensive that it evinces an

8    intent to displace § 1983 claims. *See Smith v. Robinson*, 468 U.S. at 1011. It does not

9    provide the individual plaintiff with a specific administrative remedy. *See Powell,* 189 F.3d

10   at 402 (under Title VI's enforcement mechanism, "an aggrieved individual may file a

11   complaint with the funding agency but has no role in the investigation or adjudication, if any,

12   of the complaint" (citation omitted)). The procedures are not "unusually elaborate," as they

13   were in *Sea Clammers*, *see* 453 U.S. at 13, or intentionally tailored to a specific purpose, as

14   they were in *Smith v. Robinson.* Moreover, in other contexts, the Supreme Court has found

15   that an agency's authority to cut off federal funding is insufficient to justify prohibiting

16   § 1983 claims. *See Wright v. City of Roanoke Redevelopment and Housing Auth.,* 479 U.S.

17   418, 428 (1987) (agency's "generalized powers" including power to cut off federal funds

18   "are insufficient to indicate a congressional intention to foreclose § 1983 remedies").

19       Courts have implied a right of action under Title VI against institutions that receive

20   federal financial aid. *See Alexander v. Sandoval*, 532 U.S. 275, 279 (2001), *citing Cannon v.*

21   *University of Chicago*, 441 U.S. 677 (1979); *see also* 42 U.S.C. § 2000(d)-7(a)(2). But the

22   fact that Title VI itself contains no private judicial remedy weighs against finding either a

23   comprehensive enforcement scheme, or that Congress intended to preclude suits under

24   § 1983. *See Wright*, 479 U.S. at 427 (fact that statutes considered in *Sea Clammers* and

25   *Smith v. Robinson* provided private judicial remedies evinced congressional intent to

26   supplant § 1983 remedy). Title VI's remedial scheme is similar to the one available under

27   Title IX when the Supreme Court found an implied right of action under that statute.

28   *Cousins,* 857 F.2d at 45, *citing Cannon*, *supra.* As the Sixth Circuit has observed, *Cannon*

16

1  found an implied right of action precisely *because* Title IX contained no comprehensive
2  enforcement scheme, and an implied right of action would complement the public remedy
3  created by the statute. *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 723 (6th Cir.
4  1996). Moreover, an amendment to Title VI which refers to remedies "including remedies
5  both at law and in equity" under that statute suggests that Congress did not view its
6  enforcement scheme as exclusive. 42 U.S.C. § 2000d-7(a)(2).

7  As Plaintiffs point out, Title VI provides no remedy at all against individuals who
8  discriminate on the basis of race. Nothing in Title VI suggests that Congress intended to
9  prohibit Plaintiffs from complaining of individual wrongdoing, or to abandon § 1983 as a
10 means of deterring state actors from depriving others of their civil rights under color of law.

11 The cases on which Defendants rely recognize none of these factors. *Bayon*, *supra*, is
12 inapposite because it holds only that plaintiffs cannot use § 1983 to assert Title VI rights (the
13 *Sea Clammers* analysis), and does not address whether Title VI prevents plaintiffs from
14 bringing constitutional claims on the same facts. 2001 WL 135817, *3. Although the
15 Seventh Circuit's opinion in *Boulahanis* involved constitutional claims, it is unpersuasive
16 because it relies solely on an earlier case which, like *Bayon*, held only that "private actions
17 *based on Title VI* may not be brought under § 1983." 198 F.3d at 641, *quoting Alexander v.*
18 *Chicago Park District*, 773 F.2d 850, 856 (7th Cir.1985)(emphasis added). This reasoning
19 misses a "critical distinction" between § 1983 claims asserting rights under statute and those
20 bringing constitutional claims. *Communities for Equity v. Michigan High School Athletic*
21 *Ass'n,* 459 F.3d 676, 684 (6th Cir. 2006). As the Sixth Circuit observed,

22  The Court's analysis both in *Sea Clammers* and *Rancho Palos Verdes* [*v. Abrams*] hinges on the fact that when Congress created the particular rights through statute, it
23  also created particular remedies for those statutory violations. *See Rancho Palos Verdes[v. Abrams]*, 125 S.Ct. at 1458 ("Thus, the existence of a more restrictive
24  private remedy has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would
25  not."); *see also Sea Clammers*, 453 U.S. at 20, 101 S.Ct. 2615 ("When the remedial devices provided in a particular act are sufficiently comprehensive, they may suffice
26  to demonstrate congressional intent to preclude the remedy of suits under § 1983.").

27 *Id*. But where, as here, the Plaintiffs assert that their equal protection rights have been
28 violated, their constitutional claims would be actionable even if Title VI had never been

17

enacted. The question of what Congress intended shifts from what remedies Congress intended to provide for violations of Title VI, to whether Congress intended to abandon preexisting rights and remedies in Fourteenth Amendment equal protection jurisprudence when it enacted Title VI. *See id.* (discussing Title IX).

The *Travis* and *Alexander* courts relied in part on their view that there is a "narrower private right of action" under Title VI than through § 1983 to find that § 1983 claims are foreclosed. *See, e.g., Travis*, 2007 WL 529840, *6, *citing Abrams*, 544 U.S. at 120. The implied right of action under Title VI may well have more restrictive remedies than a § 1983 claim. But the scope of a right of action subsequently implied by courts is no indication that Congress intended to supplant § 1983 claims for constitutional violations when it passed the statute. *See Communities for Equality*, 459 F.3d at 689-91. If anything, it shows that the remedy crafted by Congress was incomplete and not exclusive.

Both parties urge the Court to look to jurisprudence under Title IX of the Civil Rights Act of 1964, as it was patterned after Title VI and has been interpreted consistently with it. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (citations omitted); *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (citations omitted). Appellate courts have split on the question of whether Title IX bars constitutional § 1983 claims: the Sixth, Eighth, and Tenth Circuits have found constitutional § 1983 claims are not subsumed by Title IX; the First, Second, Third, and Seventh Circuits have found they are.[7] But Congress passed Title IX assuming that it would be interpreted in the manner that Title VI had been in the preceding 8 years – with a private right of action. *Cannon,* 441 U.S. at 696-697. Accordingly, some courts have treated Title IX's implied right of action as "part of the warp and woof of Title IX's overall remedial scheme" when determining Congress's intent. *Fitgerald*, 504 F.3d at 177, citing

---

[7] *Communities for Equity, supra, Crawford v. Davis*, 109 F.3d 1281, 1284 (8th Cir.1997); *Seamons v. Snow*, 84 F.3d 1226, 1234 (10th Cir.1996)(Title IX does not preclude § 1983 claims); *Fitzgerald v. Barnstable School Comm.*, 504 F.3d 165, 179-80 (1st Cir. 2007); *Bruneau v. South Kortfight Central School Dist.*, 163 F.3d 749, 756 (2nd Cir. 1998); *Pfeiffer by Pfeiffer v. Marion Center Area School Dist.*, 917 F.2d 779, 789 (3rd Cir. 1990); *Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996).

18

1 *Bruneau, Waid* and *Pfeiffer, supra.* In contrast, the implied right of action under Title VI was not part of the remedial scheme Congress enacted under that statute.

In finding that Plaintiffs may bring both § 1983 equal protection claims and claims under Title VI, the Court does not create a "constitutional rights exception to the *Sea Clammers* doctrine," as Defendants suggest. *See Fitzgerald,* 504 F.3d at 179. Instead, the Court recognizes that its inquiry, and its assumptions about Congressional intent, must be fundamentally different when a plaintiff presses a § 1983 claim to vindicate a federal statutory right created with its own remedial scheme, and when a plaintiff asserts a constitutional right that preexisted a parallel statutory right.

Defendants have not met their substantial burden of showing that Congress intended Title VI to be "the exclusive avenue through which a plaintiff may assert" claims alleging racial discrimination in public education. *See Smith v. Robinson*, 468 U.S. at 1009. Accordingly, the Court will not dismiss Plaintiffs' claims under § 1983.

**CONCLUSION**

Plaintiffs concede that they cannot state claims under Title VI against individual defendants, even in their "official capacity," that they cannot state a claim under 42 U.S.C. § 1983 against the School District itself, and that their state law claims under Gov. Code § 11135 are barred by the Eleventh Amendment. Accordingly, Defendants' motion is GRANTED in part, and the First Cause of Action as to the District, the Second Cause of Action as to the individual defendants, and the Third Cause of Action are dismissed with prejudice.

The remainder of Defendants' Motion to Dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: April 18, 2008

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT